## GARLAND v. CARPATHIA PETROLEUM CO. et al.

No. 11973—Opinion Filed March 4, 1924.

**1. Brokers—Right to Commission—Procuring Cause of Sale.**

When a broker is the proximate and procuring cause of a sale being made, he is entitled to a commission, but he is entitled to it only where he is the active and procuring cause in effecting the sale of the particular piece of property which he is employed to sell.

**2. Fraud—Allegations and Proof.**

It is well settled that fraud must not only be distinctly alleged, but must be clearly and satisfactorily proven, to entitle a party seeking relief on account of the fraud charged to a judgment finding that the fraudulent transaction complained of was entered into and consummated to his detriment.

**3. Judgment Sustained.**

Record examined, and held, that in the circumstances set out in this opinion the trial court did not err in sustaining a demurrer to plaintiff's evidence.

(Syllabus by Pinkham, C.)

Commissioners' Opinion, Division No. 5.

Error from District Court, Oklahoma County; Geo. W. Clark, Judge.

Action by A. S. Garland against the Carpathia Petroleum Company and others for broker's commission. Judgment for defendants. Plaintiff brings error. Affirmed.

Twyford & Smith and D. K. Pope, for plainti ffin error.

Ames, Lowe & Richardson, for defendants in error.

Opinion by PINKHAM, C. The plaintiff in error, as plaintiff, brought this action for a broker's commission against the Carpathia Petroleum Company, and the individual defendants named herein.

The petition alleged that the Carpathia Petroleum Company was a corporation; that it was the owner of an undivided one-half interest in two oil and gas leases. which were valuable oil producing properties, and which constituted all the property owned by the said corporation; that said corporation and its stockholders, officers, and directors desired to sell said leases; that the defendants J. R. Keaton, D. I. Johnston, J. S. Daniels, J. M. Van Winkle, and John Sinopoulo were the directors, and J. R. Keaton the president of said corporation: that in the latter part of May, 1915, the corporation, through J. R. Keaton, duly authorized thereunto, entered into a verbal contract with the plaintiff that if he could find and introduce a prospective buyer who would himself or in conjunction with others purchase the aforesaid property, at a price satisfactory to the defendant corporation, the defendants would pay to the plaintiff as a compensation therefor, a commission of five per centum on the amount received by the corporation or the stockholders or officers for the sale of such property, providing such prospective purchasers or a portion of them should be found and introduced within a certain time, which said time was originally fixed at 48 hours, and thereafter by the defendants extended for a peri'd of 24 hours; and that the plaintiff found and introduced certain persons within' said extended period and that afterwards certain of those persons purchased a certain portion of the stock in said corporation, whereby the corporation and the directors thereof became liable to plaintiff for a commission of five per cent. upon the price paid for the stock.

The defendants filed a verified answer admitting the corporate existence of the Carpathia Petroleum Company, and its ownership of the leases mentioned, and denying all of the other averments contained in the petition.

A jury trial was had and the plaintiff offered his evidence and rested, and the defendants demurred thereto. The demurrer to the evidence was sustained, and judgment entered in favor of the defendants. Plaintiff's motion for a new trial was overruled, and he appeals.

The plaintiff in error claims: First, that the trial court erred as a matter of law in overruling his motion for a new trial; Second, the trial court erred as a matter of law in sustaining the demurrer of the defendant corporation. Carpathia Petroleum Company, to the evidence of the plaintiff, and in entering judgment in its favor for costs; third, the trial court erred in sustaining the demurrer of the individual defendants to

the evidence of plaintiff and in entering judgment for costs in their favor.

In the brief of plaintiff in error this assignment is discussed under the following propositions: First, the trial court erred in holding that the plaintiff's evidence failed to make out a case against the corporation and of the defendants; second, the trial court erred in holding that the plaintiff's evidence failed to make out a case against the individual defendants sufficient to go to the jury.

The theory of the plaintiff is that the defendant company, by and through its directors, made an express verbal contract with the plaintiff, to the effect that if he introduced it to a purchaser for its property, he was to receive for his services a commission in the sum of $20,000 if the property sold for $420,000, or five per cent. of any sum received if it sold for less than that amount.

It is contended that the evidence in behalf of plaintiff shows that he performed this contract by introducing the defendants to certain persons who became the subsequent purchasers of stock in the company, and that the sale of this stock was due to the efforts of the plaintiff.

The evidence discloses that the plaintiff was, in May, 1915, a stockholder in the defendant corporation, and the owner of 175 shares of its stock, of a par value of $2,500 per share, and that the total stock of the company was $120,000; that the company was itself the owner of a one-half interest in an oil and gas lease in the Cushing field containing 75 acres, and the entire lease upon another tract in Creek county, consisting of 95 acres; that both tracts had been developed and production had been found upon both; the production on the 93 acre tract was very small, but the production on the 73 acre tract was, in May, 1915, four or five thousand barrels a day; that the defendant company owned no other property, and the company wanted to sell the property. On or about May 24, 1915, the plaintiff had a conversation with the defendants about the sale of the property. Prior to that time the property had been on the market and had been listed with George E. Black, an oil broker, living in Tulsa, but he had failed to sell it; that the title to the lease was bad and in litigation. Before the plaintiff saw the directors about the sale of the property he had a conversation with one Franklin Garland, in Tulsa, a distant relative, about the sale of the company's property in the Cushing field (the 73 acre tract) and ascertained from him that he had a prospective buyer for the property. The plaintiff then came back to Oklahoma City and stated to the president of the defendant company that he had come there to see if he could get the property for sale; that he had a prospective buyer at Tulsa who wanted Cushing production, would pay a good price for it, and was well able to buy. Later that day the plaintiff at a meeting of the directors of the company asked them if they had made up their minds to let him have the property for sale. They inquired about the ability of the buyer to pay for the property, and plaintiff stated that "he was informed by a man who was helping him in Tulsa, that they (the prospective purchasers) were well able to buy anything they would undertake to buy"; that they wanted some good production in the Cushing field and would look into the matter as quickly as possible.

At this meeting of the directors of the company, an agreement was entered into by the terms of which the plaintiff was to receive $20,000 if he got $420,000 for the property; but if he sold for less he was to receive five per cent. on the price that was received, and the plaintiff was to get the prospective purchasers at the company's office in Oklahoma City within 48 hours. In stating the terms of this agreement the plaintiff testified:

"Finally I told them that I would make a price of $420,000 and reserve all the oil to us in the pipe lines and tanks up to the time the deal was closed, the purchasers to take the title as it was and they all assented."

Plaintiff then testified that he immediately phoned Franklin Garland at Muskogee and told him what he had done and directed him to get his men together and get them to the company's office in Oklahoma City as quickly as possible. Plaintiff then sent Franklin Garland the following letter:

"You have sale of the Carpathia Petroleum Company half interest in lease, the west half, northeast quarter section 17, township 18 north, range 7 east, containing 73 acres, for the sum of $420,000 net, no commission, all oil runs in pipe line and tanks up to date of closing deal, buyer to take title as it now is."

Prior to the expiration of the 48 hours the plaintiff requested the president of the company to extend the time to produce the prospective buyers and the president informed him that he would "exend the time

until five o'clock Thursday evening (May 27th) quitting time in the office."

The prospective buyers arrived Thursday afternoon, May 27th, and the plaintiff met them. Franklin Garland was with them; the other parties, the proposed purchasers, were George H. Johnson, a Mr. Kerr, and a Mr. Lancaster. The plaintiff escorted them to the office of the company and introduced them to the company's president. Plaintiff testified that he said to the president of the company:

"These are the men I have been trying to get over here for some little time, and their business is to buy some oil property, if they can arrange a deal."

The 48 hour limit and extension expired at 5 o'clock that afternoon, but a meeting of the prospective purchasers and the board of directors was held that night in which the matter was discussed until 11 o'clock, and it clearly appears from the evidence of the plaintiff and of the proposed purchasers that the prospective buyers were not in a position to buy the property in question at the time. In detailing what occurred at this meeting the plaintiff testified:

"They stated that they had not come prepared to buy, but merely to investigate the title and conditions, and subsequently to investigate the property to determine if they would buy."

The plaintiff's testimony is to the effect that the parties agreed to meet at Tulsa on the Saturday following to take up further negotiations about the deal.

O. M. Lancaster, one of the prospective buyers, testified as a witness for the plaintiff that the proposition submitted to them was that if they wanted to take the property at the price fixed without any further investigation they could have it; if not the deal was off as the company was looking for a report from the field where it was deepening two wells and if these wells went into water the purchasers would not want the property and if it increased the production the company would not want to sell at that price; that they tried to get an option on the property: that the directors stated that they would have to close the deal, sign up a contract before hearing from the field; that Johnson, Lancaster, and Kerr refused to do that, and when the report from the field man came in the deal was declared off, and that at no time prior to the time the deal was declared off was the witness and his associates in a position to close the transaction.

O. M. Kerr, called as a witness for the plaintiff, testified that they went to Oklahoma City "to tie the property up so that they could get a look at it"; that the company refused to give any option and wanted the contract closed right then; that it was declared absolutely off and the witness considered it off. This witness further testified that at the meeting on the night of May 27th, the company stated that if the deal was closed at all it had to be done before they heard from the field and learned the result of deepening the two wells.

The plaintiff and Francis Garland both testified that after the night of May 27th, neither of them had any communication with Johnson, Lancaster, or Kerr, or with any other person said to have been associated with them in regard to the purchase of the property in question.

It is clear that the parties who came to the company's office through the efforts of the plaintiff on May 27th, did not purchase the property at that time, and that after May 27th there were no further negotiations with those parties or with their associates. The plaintiff testified that if the parties introduced by him did not purchase, he was not to receive a commission.

Charles G. Wilson, another of the prospective buyers who was prevented from attending the meeting of May 27th, testified that when Kerr, Lancaster, and Johnston returned to Tulsa from the meeting of the company's office on the 27th day of May. "I asked what the result of their negotiations were" and they said "Judge Keaton (president of the company) had called the deal off."

He testified further that after these parties returned to Tulsa, they dropped the matter, and this witness further stated: "We did drop it absolutely, and started negotiaing for another piece of property, the Black Panther lease over there.

This witness further testified that on the next day (May 29) Judge Keaton came to Tulsa on "another mission"; that "he talked about the matter a little bit, not in a serious way because he did not think we could go any further with it, but he stated very emphatically, with a good deal of emphasis, that there was no use to consider the proposition any further, and he left the office." He further testified that "we never thought of the property again until the matter was brought to my attention by Mr. Aiken," and that he never went out to see the property

until Mr. Aiken had negotiated for purchasing the stock in the latter part of June.

It appears that in the latter part of June F. M. Aiken started negotiations to purchase the stock through George E. Black and Mr. McMullen, brokers; that Aiken purchased about 90 per cent. of the stock on the basis of three for one, and that Aiken brought Mr. Mosher into the deal, and Kerr, Lancaster, and Johnson took a limited amount of the stock which Aiken purchased in the company and paid Mr. Aiken for it.

It clearly appears that George E. Black, a broker, interested Aiken in the purchase of the stock in the defendant company late in June and the stockholders of the company who sold their stock paid Black a commission of $10,000.

It is not contended that either the plaintiff or Franklin Garland ever introduced Mr. Aiken to the company or to any of its stockholders, or that the plaintiff or Franklin Garland did anything to induce him to purchase the stock.

Plaintiff's contract with the board of directors was a contract with the corporation to sell within a limited time its one-half interest in a certain oil and gas lease. The time expired without a sale being made. Weeks after the expiration of the time agreed upon, 25 stockholders, including the plaintiff, sold to different persons through another broker their stock in the corporation on the basis of three for one.

"If the services of the agent, whatever they be, fail to accomplish a sale and several weeks have elapsed after the proposed purchaser has decided not to buy, he is induced by another party to consider the matter, and then makes the purchase as the consequence of such secondary or intervening influence, the agent has no right to a commission." Yarborough v. Richardson, 38 Okla. 11, 131 Pac. 680.

Plaintiff says in his brief:

"It was simply a question of fact for the jury to say whether or not the parties introduced by the plaintiff were the same who purchased the property, and if they were, whether the plaintiff's efforts were the procuring cause of the sale."

It is sufficient to say that the plaintiff himself testified in this case; that his contract with the defendant only included the company's half interest in the 73 acre lease; that his efforts to carry out that contract consisted of notifying Franklin Garland that the particular property could be bought and that he, Franklin Garland, had the sale of

it, and that he introduced the parties that Franklin Garland brought to the company's office to buy that property, or at least to enter into negotiations for the purchase of it. Such and such only were the services rendered by the plaintiff. That his efforts to carry out this contract proved unsuccessful admits of no question.

"When a broker is the proximate and procuring cause of a sale being made, he is entitled to his commission, but he is entitled to it only when he is the active and procuring cause in effecting the sale of the particular piece of property which he is employed to sell. * * *" Duncan v. Hicks (Mo.) 135 S. W. 450.

There is no evidence in this record tending to support the allegation in the pleadings that the plaintiff was the procuring cause of the sale of the stock to Mosier and Aiken.

The cases cited by plaintiff in error to the effect that the question of procuring cause is one of fact for the jury are not applicable to a case where there is no evidence tending to show that the plaintiff's efforts were the procuring or inducing cause of the sale.

"To entitle a real estate broker to his commission, he must be the efficient cause in finding a purchaser, and it is not sufficient that the act of the broker was one of the chain of causes bringing about the sale." Crain v. Miles (Mo.) 134 S. W. 52.

Plaintiff alleges in his petition, in effect, that the sale of the stock was made instead of the sale of the lease for the express purpose of defeating his commission. We are constrained to say that the evidence contained in the record lends no support to such allegation. There is no evidence in the record that the purchasers of the stock were ever willing to purchase the oil and gas lease.

F. M. Aiken, who purchased $108,000 out of $120,000 par value of the stock was led to make that purchase, not by the plaintiff or Franklin Garland, but by another broker long after all negotiations with the parties the plaintiff had introduced to defendants for the purpose of effecting a sale of the oil and gas lease terminated.

Counsel for plaintiff in error say in their brief:

"Another significant contract made by J. R. Keaton and his associates with the Carpathia Petroleum Company, October 11, 1915, provides that the former will jointly and severally hold the Carpathia Petroleum Company harmless from any and all claims and demands which may be made by A. S. Garland or Franklin Garland by

reason of any contract made by either of them with the Carpathia Petroleum Company for or on account of the sale of the stock of said company to M. H. Mosier and F. M. Aiken."

It is sufficient to say that in the contract for the sale of the stock attached to plaintiff's petition, it appears that Aiken and Mosier purchased $108,000 out of the $120,000 of the capital stock of the company, and that the selling stockholders were to receive their pro rata part of the proceeds of all sales and transfers of oil made by the company prior to June 1, 1915, and their pro rata part of one-half of all sales of oil which should be made by the company between June 1 and June 30, 1915, which had not already been paid by the pipe line companies; one D. I. Johnston was made trustee for the selling stockholders for the purpose of receiving from the Carpathia Petroleum Company said proceeds of the sales of oil and making distribution thereof. Also the selling stockholders agreed to pay the gross production taxes due up to July 1, 1915, and one-half of the year's income taxes, both state and federal.

On June 30th, after the contract of sale had been executed, the plaintiff made a demand upon the Carpathia Petroleum Company for $18,000 commission for effecting the sale of the stock.

The witness, Wilson, testified that after the stock had been purchased, Franklin Garland called him up and demanded a commission. It appears that when these parties began claiming commissions from the Carpathia Petroleum Company, it refused to pay the selling stockholders their pro rata share of the proceeds of the oil sold until they indemnified the company from liability for these commissions.

As before stated the sale of the stock was made on June 29th. The indemnity bond was executed on October 11th, in order that the selling stockholders might get their pro rata part of the proceeds of the oil runs reserved to them in the contract of sale. The plaintiff was one of those stockholders and the proceeds of the oil reserved were paid to D. I. Johnston as trustee for the selling stockholders, only after this bond had been executed.

"It is well settled that fraud must not only be distinctly alleged, but must be clearly and satisfactorily proven to entitle a party seeking relief on account of the fraud charged to a judgment finding that the fraudulent transaction complained of was entered into and consummated to his detri-

ment." Lemp Brewing Co. v. Guion, 17 Okla. 134, 87 Pac. 584.

The evidence offered in this case fails to establish any fraudulent acts on the part of the defendants. We are of the opinion that there was no error in the order of the trial court sustaining the demurrer to the plaintiff's evidence.

The judgment of the trial court, we think, should be affirmed.

By the Court: It is so ordered.